## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

|  |  |  |
|---|---|---|
| **THOMAS A. ADDINGTON,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:19cv00007 |
| v. | ) | |
| | ) | **REPORT AND** |
| **ANDREW SAUL,**[1] | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

### *I. Background and Standard of Review*

Plaintiff, Thomas A. Addington, ("Addington"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'""" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Addington protectively filed his application for DIB on February 9, 2015, in which he alleged disability as of May 30, 2010, based on Crohn's Disease; anxiety; depression; tachycardia; sleep apnea; shortness of breath; facial skin cancer; numbness and stiffness in the hands; and swelling and pain in the legs and feet. (Record, ("R."), at 12, 73-74, 176-77, 195, 216.) The claim was denied initially and upon reconsideration. (R. at 94-96, 100-02, 105, 107-12.) Addington then requested a hearing before an administrative law judge, ("ALJ"). (R. at 114-15.) The ALJ held a hearing on September 7, 2017, at which Addington was represented by counsel. (R. at 27-67.)

By decision dated December 11, 2017, the ALJ denied Addington's claim. (R. at 12-22.) The ALJ found that Addington met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2012. (R. at 14.) The ALJ found that Addington had not engaged in substantial gainful activity from May 30, 2010, the alleged onset date, through December 31, 2012, the date last insured.[2] (R. at 14.) The ALJ determined that, as of the date last insured, Addington had severe impairments, namely degenerative disc disease, ("DDD"), and osteoarthritis of the back; and osteoarthritis of the right knee, but he found that Addington did not have an impairment or combination of impairments that met or

---

[2] Therefore, Addington must show that he was disabled between May 30, 2010, the alleged onset date, and December 31, 2012, the date last insured, in order to be eligible for benefits.

medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-17.) The ALJ found that Addington had the residual functional capacity to perform medium[3] work that required no more than frequent use of foot controls with the right lower extremity, balancing or stooping; and no more than occasional climbing of ramps, stairs, ladders or scaffolds, kneeling, crouching or crawling. (R. at 17-18.) The ALJ found that Addington was unable to perform his past relevant work. (R. at 20.) Based on Addington's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Addington could perform, including the jobs of a packer, a bagger and a warehouse worker. (R. at 21-22.) Thus, the ALJ concluded that Addington was not under a disability as defined by the Act at any time from May 30, 2010, through December 31, 2012, and was not eligible for DIB benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Addington pursued his administrative appeals, (R. at 174), but the Appeals Council denied his request for review. (R. at 1-5.) Addington then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Addington's motion for summary judgment filed August 8, 2019, and the Commissioner's motion for summary judgment filed October 2, 2019.

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2019).

*II. Facts*[4]

Addington was born in 1952, (R. at 37, 176), which, at the time of his alleged onset date, classified him as a "person of advanced aged," and at the time of his date last insured, classified him as a "person closely approaching retirement age," both under 20 C.F.R. § 404.1563(e). He has a high school education with approximately two years of college instruction and training in the electrical field. (R. at 37, 196.) He has past work experience as a maintenance technician for a flooring company, a mine machine mechanic and a mine inspector. (R. at 58-59.) Addington testified he last worked in the coal mining industry, but the mine where he worked shut down in May 2010. (R. at 37.) He further stated that his physical impairments prevented him from continuing to perform mining work at that time. (R. at 37-38.) He testified that, at the time he last worked in the coal mine, he could no longer lift rock dust bags, and he was having to stop and use the restroom about five times per shift, which took approximately 15 minutes each time. (R. at 43-44.) Addington stated this made it difficult for him to get his job done. (R. at 44.) He stated he was leaving approximately one-third of his work undone for the oncoming shift. (R. at 45.) Addington further testified he was experiencing "extreme rectal pain," and his feet and legs would swell, causing difficulty bending and crawling. (R. at 43.) He stated he had not been diagnosed with Crohn's Disease at that time. (R. at 43.) Addington testified that after 2010 and up to 2012, the rectal pain and restroom visits were "steadily getting worse," and by 2012, he was using the restroom every 30 minutes. (R. at 45-46.) In particular, Addington stated he was having chronic diarrhea. (R. at 46.) He stated he took Imodium and other medications to try to help him get through his shift. (R. at 46.) Addington also testified he was having trouble with

---

[4] Because the relevant time period for determining disability in this case is from May 30, 2010, through December 31, 2012, the court largely will limit its recitation of the medical evidence to this timeframe.

his right knee during this same time, which he had injured while working. (R. at 46.)
He stated this knee and leg would swell daily, which made it difficult to "get down
and walk on [his] knees." (R. at 46-47.)  Addington stated he had been prescribed a
knee brace, but it was impossible to wear it in the mines, as it prevented him from
bending his knee and crawling. (R. at 46.)  He testified he sometimes had to elevate
his leg on a buggy for about 30 minutes and wait for the swelling to subside before
returning to work. (R. at 47.)  Addington testified he had to elevate his leg three to
four times per shift, which interfered with the performance of his job duties. (R. at
47.)  He stated that, during the relevant time period, he could be on his feet for up to
30 minutes without interruption.  (R. at 48.)  Addington testified that he also
experienced rectal pain and could not control his bowels during this time, causing
him to soil himself. (R. at 48-49.)  He stated he began having difficulty sleeping
around 2009, caused by breathing problems. (R. at 49.)  Addington stated he was
tired when he went to bed and tired when he got up, and this was causing him to
"los[e his] strength." (R. at 49.)  He testified he obtained a sleep apnea machine in
2010. (R. at 49.)  Addington testified he also had lost weight due to the chronic
diarrhea, noting he weighed 250 pounds in 2010, but lost about 90 pounds, getting
down to 158 pounds. (R. at 50.)  Addington stated he had tried several types of
medications for this problem, some of which did not work. (R. at 50.)  He stated he
currently was taking Entyvio, which was an infusion. (R. at 50.)  He stated that,
during the relevant time period, breathing difficulty, knee pain and rectal pain
affected his ability to stand and walk. (R. at 51.)  He further stated the rectal pain
made it difficult to sit on hard surfaces and ride in and out of the mines. (R. at 51.)
He stated that, during that same time, he could lift and carry about 12 pounds. (R.
at 51-52.)

Addington also testified he had a melanoma on his face removed. (R. at 51.)

He stated he had multiple family members die from cancer, which caused him anxiety. (R. at 51.) Addington testified he had experienced bilateral double vision since 2008 or 2009, which was treated at The Regional Eye Center. (R. at 55.) He stated the right eye was worse than the left. (R. at 55.) He stated this made it very difficult for him to read and fill out reports, which he had to do in the mines. (R. at 55.) Addington testified he continued to have double vision, and activities like stooping, bending, squatting and kneeling worsened this condition. (R. at 55-56.) Addington testified he began treating with Dr. Nida in approximately 2000. (R. at 53.) He stated that, since 2012, he saw Dr. Nida either monthly or every three months. (R. at 54.)

Addington testified he continued to have difficulty with his right knee and leg since he stopped working. (R. at 47.) However, he stated he could now wear a knee brace. (R. at 47.) Addington stated he continued to need to elevate his feet in a recliner. (R. at 48.)

Robert Jackson, a vocational expert, also was present and testified at Addington's hearing. (R. at 57-65.) He classified Addington's past work as a maintenance technician for a flooring company as heavy[5] and skilled; as a mine machine mechanic as medium[6] and skilled; and as a mine inspector as light[7] and

---

[5] Heavy work involves lifting and carrying items weighing up to 100 pounds at a time with frequent lifting and carrying items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2019).

[6] Medium work involves lifting and carrying items weighing up to 50 pounds at a time with frequent lifting and carrying items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2019).

[7] Light work involves lifting and carrying items weighing up to 20 pounds at a time with frequent lifting and carrying items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

skilled, but medium as performed by Addington. (R. at 58-59.) Jackson testified that a hypothetical individual who would be off task 15 percent of an eight-hour workday, in addition to normal breaks and normal expected time off task, could not perform competitive employment. (R. at 59.) Likewise, Jackson testified that an individual who would be absent from work two or more times monthly could not perform competitive employment. (R. at 59.) Jackson was asked to consider a hypothetical individual of Addington's age, education and work history, who could perform medium work, except he could frequently use foot controls with the right lower extremity, frequently balance and frequently stoop; and he could occasionally climb ramps, stairs, ladders or scaffolds and occasionally kneel, crouch and crawl. (R. at 60.) Jackson testified such an individual could not perform Addington's past work, but could perform other jobs existing in significant numbers in the national economy, including those of a packer, a bagger and a warehouse worker. (R. at 60-61.) Jackson next was asked to consider the same hypothetical individual, but who was limited to the performance of light work. (R. at 61.) Jackson again testified this individual could not perform any of Addington's past work, but could perform jobs existing in significant numbers in the national economy, including those of a cashier, a marker and a counter clerk. (R. at 61-62.) Jackson testified that a hypothetical individual who could work only two hours out of an eight-hour workday, could not perform any competitive employment. (R. at 64.) Next, Jackson testified that a hypothetical individual who could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds, could not perform either medium or heavy exertion level jobs. (R. at 65.)

In rendering his decision, the ALJ reviewed medical records from Dr. William Rutherford, Jr., M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Dr. Robert Mogul, M.D., a state agency physician; Maurice Prout,

Ph.D., a state agency psychologist; Wellmont Lonesome Pine Hospital; Southwest VA Outpatient Center; Mountain View Regional Medical Center; Wellmont Medical Associates; Dr. Maurice Nida, D.O.; Dermatology Associates of Kingsport, PC; Gastroenterology Associates; Watauga Orthopaedics; Norton Community Hospital; The Regional Eye Center; and Dermatopathology Partners, PC.

The record shows that Addington received treatment from Dr. Anthony Seaton, M.D., at The Regional Eye Center, from 2009 through 2017. These records show that Addington had a pterygium[8] of the right eye surgically removed in February 2009. (R. at 542.) In March 2009, he began to complain of double vision in the right eye when looking to the left. (R. at 538.) Addington was diagnosed with double vision in both eyes in June 2009. (R. at 537.) He continued to express these complaints throughout the relevant time period; however, the treatment records indicate that Addington repeatedly elected to undergo no treatment. (R. at 527, 529, 531.) Dr. Seaton advised him to call if his symptoms worsened. (R. at 527, 531.) The treatment records also indicate that the pterygium in the right eye had mildly recurred by September 2009. (R. at 535.) In July 2011, Addington indicated no noticeable vision changes since his previous visit in April 2010, and, in addition to the mildly recurred pterygium and bilateral double vision, Dr. Seaton diagnosed dry eye syndrome, dermatochalasis[9] in both eyes and allergic conjunctivitis. (R. at 529-31.) He instructed Addington to use artificial tears as needed and to consider drops if the tears did not improve his symptoms. (R. at 531.) Dr. Seaton opted to observe

---

[8] A pterygium, also called surfer's eye, is a growth of pink, fleshy tissue on the conjunctiva, which usually forms on the side closest to the nose and grows toward the pupil area. If the growth gets onto the cornea, it could change its shape and cause blurry vision or double vision. *See* webmd.com/eye-health-pterygium-surfers-eye#1 (last visited Sept. 10, 2020).

[9] Dermatochalasis refers to redundant and lax eyelid skin and muscle. *See* emedicine.medscape.com/article/1212294-overview (last visited Sept. 10, 2020).

the dermatolochalasis and pterygium.  (R. at 528, 531.)  On July 26, 2012, Dr. Seaton also noted Addington had cataracts in both eyes, which he opted to observe at that time.[10]  (R. at 527.)

The record shows that Addington has a history of treatment for squamous cell carcinoma of the right preauricular area.  (R. at 371.)  He treated at Dermatology Associates of Kingsport, PC, during the relevant time period for various skin complaints, including rosacea, actinic keratosis, ("AK"),[11] seborrheic keratosis, ("SK")[12] and lentigines.[13]  On July 29, 2010, Addington saw Dr. Russell D. Mader, M.D., with complaints of a tender spot in front of the right ear.  (R. at 370.)  Dr. Mader noted Addington's history of skin cancer of the right preauricular area, and Addington stated the site seemed to be doing "pretty good."  (R. at 370.)  Areas of erythema were noted across the face, as well as some lentigines and an occasional SK.  (R. at 370.)  Dr. Mader noted three AKs, which were treated with liquid nitrogen.  (R. at 370.)  He also diagnosed Addington with a focal pustule on one of Addington's proximal nail folds of the finger on the right hand, which Dr. Mader drained.  (R. at 370.)  He noted Addington had a history of being diagnosed with

---

[10] The record indicates that Addington eventually underwent cataract surgery on his right eye in November 2016 and on his left eye in December 2016, nearly four years after the expiration of his date last insured.  (R. at 506, 508.)

[11] Actinic keratosis refers to a rough, scaly patch on the skin that develops from years of exposure to the sun. A small percentage of these lesions can eventually become skin cancer. *See* mayoclinic.org/diseases-conditions/actinic-keratosis/symptoms-causes/syc-20354969 (last visited Sept. 10, 2020).

[12] Seborrheic keratosis are brown, black or light tan growths that appear waxy, scaly and slightly raised. They are common, noncancerous growths commonly associated with aging. *See* mayoclinic.org/diseases-conditions/seborrheic-keratosis/symptoms-causes/syc-20353878   (last visited Sept. 10, 2020).

[13] Lentigines refer to spots on the skin that are darker (usually brown) than the surrounding skin.  *See* webmd.com/skin-problems-and-treatments/qa/what-are-lentigines (last visited Sept. 10, 2020).

rosacea by his primary care doctor, but without treatment. (R. at 370.) Dr. Mader treated the rosacea with MetroGel and planned to re-evaluate Addington in one month. (R. at 370.) On January 25, 2011, Addington complained of a left neck lesion, which Dr. Mader biopsied. (R. at 368.) Addington requested removal of a skin tag from his upper mid back, which Dr. Mader did. (R. at 368.) He complained of a sensitive area on the right temple area, and Dr. Mader noted three superficial appearing AKs on the right side of Addington's face. (R. at 368.) He treated these with liquid nitrogen. (R. at 368.) Addington reported flares of his rosacea with folliculitis, noting he occasionally got painful facial bumps. (R. at 368.) He further reported breakouts on his neck. (R. at 368.) Dr. Mader noted a macular erythema on the central face, an inflamed papule with a pustule on the right chin and several inflammatory, follicular-based papules on the anterior neck. (R. at 368.) Dr. Mader prescribed Doxycycline and MetroCream. (R. at 368.) On February 4, 2011, Addington was advised that his biopsy revealed a hyperkeratotic AK which needed liquid nitrogen treatment. (R. at 367, 377.) This was scheduled for February 28, 2011. (R. at 367.) On that day, Addington stated his face was "doing much better." (R. at 366.) Dr. Mader noted no central erythema, but a few spider veins were present. (R. at 366.) He discontinued the Doxycycline, but continued the MetroCream. (R. at 366.) Addington noted a "scaly spot" on the corner of his right eye, which was treated with liquid nitrogen. (R. at 366.) The spot on Addington's neck, which previously had been biopsied, was resolved. (R. at 366.) On May 31, 2011, Addington complained of a lesion on the right upper lip, which Dr. Mader biopsied. (R. at 365.) Addington also complained of some rough, scaly lesions on his left arm, which were treated with liquid nitrogen. (R. at 365.) Regarding the rosacea, Addington stated the MetroCream was "doing a good job." (R. at 365.) However, he reported continued breakouts with some areas on the face, chest and third digit of the left hand. (R. at 365.) Dr. Mader prescribed minocycline, and he

continued Addington on MetroCream. (R. at 365.) The biopsy of Addington's upper lip revealed an inflamed SK. (R. at 376.) On June 28, 2011, Addington reported doing "some better." (R. at 363.) He stated the minocycline caused joint and muscle discomfort, and he requested to switch to a different antibiotic. (R. at 363.) Dr. Mader noted the rosacea remained active on Addington's face, and Addington complained of a cyst-like lesion on the right neck. (R. at 363.) The lesion that had been on the third finger of the left hand had resolved. (R. at 363.) On examination, Dr. Mader noted papular erythematous lesions on the face, as well as an erythematous cyst-like lesion on the right lateral neck. (R. at 363.) Dr. Mader discontinued the minocycline, and he prescribed Bactrim DS. (R. at 363.) He continued Addington on the MetroCream, and he stressed the importance of sunscreen and sun protective clothing. (R. at 363.) On August 1, 2011, Addington stated he was doing "much better" on Bactrim, and he was pleased with the response. (R. at 361.) He stated he had not had any real outbreaks except an occasional bump in the scalp. (R. at 361.) However, Addington reported a little bit of tenderness in the mouth. (R. at 361.) On examination, Dr. Mader noted one resolving papule on the left cheek and one on the scalp. (R. at 361.) Dr. Mader discontinued Bactrim, prescribed Clindamycin solution for the scalp and increased the MetroCream. (R. at 361.) On April 20, 2012, Addington presented with numerous keratotic lesions consistent with AKs, which he treated with liquid nitrogen. (R. at 359.) No rosacea was noted, and this condition was deemed stable. (R. at 359.) Dr. Mader also observed numerous lentigines and SKs, which did not require treatment. (R. at 359.)

On May 3, 2011, x-rays of Addington's right leg showed an old fracture deformity of the right tibia and fibula, as well as degenerative arthritis of the right knee. (R. at 399-400.) A CT scan of the pelvis, dated September 23, 2011, showed an uncomplicated left inguinal hernia containing a loop of proximal sigmoid colon.

(R. at 401-02, 413.)  There was no evidence of bowel obstruction, but vascular calcifications were identified, as well as moderate degenerative changes at the L5-S1 level of the spine.  (R. at 401, 413.)  On October 13, 2011, Addington underwent a surgical repair of his inguinal hernia without any complications.  (R. at 273-74, 411-12.)

On July 16, 2012, Addington saw Dr. Maurice Nida, D.O., at Southwest VA Outpatient Center, for a routine, three-month follow-up appointment.  (R. at 406.) He had no complaints or concerns at that time, he stated he felt very well, and he stated he was sleeping well.  (R. at 406.)  Dr. Nida noted that Addington had been compliant with instructions, and he had no medication side effects.  (R. at 406.)  Dr. Nida rechecked Addington's osteoarthritis, which he had experienced for years, and which was located in the upper and lower back, as well as the right knee and shin due to a previous injury.  (R. at 406.)  It was noted that Addington experienced intermittent symptoms, which was unchanged, and which he treated with over-the-counter aspirin.  (R. at 406.)  Dr. Nida also noted Addington's history of obstructive sleep apnea, which Addington characterized as moderate in severity and improving. (R. at 406.)  Dr. Nida noted that Addington had good compliance with treatment of continuous positive airway pressure, ("CPAP"), therapy and good symptom control. (R. at 406.)  At this visit, Addington complained of new facial lesions, but he did not complain of back pain, abdominal pain or change in bowel habits.  (R. at 407.)  The only remarkable findings on examination were soft nodules at the glabella[14] and left cheek, as well as deformities of the both fifth digits at the proximal interphalangeal, ("PIP"), joints.  (R. at 407-08.)  Dr. Nida diagnosed Addington with osteoarthritis of the knee, rosacea, obstructive sleep apnea and obesity.  (R. at 408.)  He continued

---

[14] The glabella refers to the area between the eyebrows, just above the nose.  *See* medicinenet.com/script/main/art.asp?articlekey=26213 (last visited Sept. 10, 2020).

Addington on aspirin for his osteoarthritis, he instructed him to follow up with his specialist for his rosacea, and he indicated Addington's obstructive sleep apnea was controlled with CPAP therapy.  (R. at 408.)  Dr. Nida indicated there was "no somatic dysfunction" on examination.  (R. at 408.)

Dr. Nida completed an Assessment Of Ability To Do Work-Related Activities (Physical) on May 26, 2015, approximately two and one-half years after the expiration of Addington's date last insured.  (R. at 415-17.)  Dr. Nida opined Addington could lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; stand/walk for a total of one hour in an eight-hour workday, and he could do so for one hour without interruption; sit for a total of one hour in an eight-hour workday, but for 30 minutes without interruption; occasionally climb, stoop and balance, but never kneel, crouch or crawl; his abilities to reach, to handle, to feel and to push/pull all were affected by his impairment; he could  not work around heights or moving machinery; and he would be absent from work more than two days monthly.  (R. at 415-17.)  Dr. Nida stated all these restrictions were based on Addington's low back pain.  (R. at 415-17.)

On June 4, 2015, Dr. William Rutherford, Jr., M.D., a state agency physician, in connection with the initial determination of Addington's DIB claim, found that the evidence in the claim file was insufficient to fully evaluate the claim, and the evidence needed could not be obtained.  (R. at 78.)   That being the case, Dr. Rutherford found Addington's condition was not disabling at any time through the date last insured.  (R. at 78.)  In reaching this conclusion, Dr. Rutherford considered Addington's 2009 skin cancer diagnosis, the May 2011 right leg x-rays, the August 2011 pelvic CT, the October 2011 hernia repair and the July 2012 follow-up visit with Dr. Nida.  (R. at 75-76.)   Similarly, Julie Jennings, Ph.D., a state agency

psychologist, found insufficient evidence prior to the date last insured to make a decision on Addington's claim.  (R. at 76-77.)

On reconsideration, Addington submitted additional medical evidence, all of which was from 2015, multiple years after the expiration of his date last insured.  (R. at 81-84.)   A disability examiner documented a telephone call to Addington's "Authorized Representative," who indicated Addington had neither seen nor had any other sources for the relevant time period.  (R. at 84.)  On August 27, 2015, Dr. Robert Mogul, M.D., another state agency physician, concluded there still was not enough information for the relevant time period for either a medical or mental assessment, and there was no evidence to support the presence of a severe medically determinable impairment.  (R. at 85.)  Thus, Dr. Mogul concluded Addington's condition was not disabling on any date through the date last insured.  (R. at 88.) Likewise, on September 8, 2015, Maurice Prout, Ph.D., a state agency psychologist, concluded there was insufficient evidence through Addington's date last insured. (R. at 86.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review

does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ

may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings. Under the regulations, the weight afforded to any medical opinion is dependent on a variety of factors, set forth in 20 C.F.R. § 404.1527(c), including (1) the examining relationship; (2) the treatment relationship; (3) the supportability of the source's opinion; (4) the consistency of the opinion with the record; and (5) the specialization of the source. *See* 20 C.F.R. § 404.1527(c) (2019).

In his brief, Addington argues that the ALJ's residual functional capacity finding is not supported by substantial evidence of record. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4.) Specifically, he argues that the ALJ erred in his weighing of the medical evidence, in that he gave little weight to the May 2015 opinion of his treating physician, Dr. Nida, instead relying on the opinions of the state agency examiners. (Plaintiff's Brief at 5.) Addington argues that, in doing so, the ALJ improperly substituted his opinion for that of a trained medical professional in assessing the severity of his impairments during the relevant time period, which, in turn, was used as a basis for his ultimate residual functional capacity finding. (Plaintiff's Brief at 5.)

The ALJ found that Addington had the residual functional capacity to perform medium work that required no more than frequent use of foot controls with the right lower extremity, balancing or stooping; and no more than occasional climbing of ramps, stairs, ladders or scaffolds, kneeling, crouching or crawling. (R. at 17-18.) In making this residual functional capacity finding, the ALJ stated that he was giving "little weight" to the May 2015 opinion of Dr. Nida, Addington's primary care provider. (R. at 20.) In particular, the ALJ noted

that this opinion was dated two and one-half years after Addington's date last insured. (R. at 20.) He further noted that Dr. Nida's only treatment of Addington during the relevant time period was a "recommendation that he continue to take aspirin." (R. at 20.) Dr. Nida did not prescribe prescription pain medication, epidural steroid injections or physical therapy. (R. at 20.) The ALJ noted that, during his only appointment with Dr. Nida during the relevant time, Addington reported that he was doing "very well," and he voiced no complaints or concerns. (R. at 20.) All of this being the case, the ALJ found that Dr. Nida's treatment notes during the relevant period did not support his May 2015 opinion. (R. at 20.) *See* 20 C.F.R. § 404.1527(c)(3) (2019) (more weight will be given to a medical opinion supported by relevant evidence, including medical signs and laboratory findings). Moreover, the ALJ found that Dr. Nida's "extreme limitations" were inconsistent with the record as a whole. (R. at 20.) *See* 20 C.F.R. § 404.1527(c)(4) (2019) (generally, the more consistent a medical opinion is with the record as a whole, the more weight it will be given).

I first note that Dr. Nida's assessment of Addington, performed approximately two and one-half years after the expiration of his date last insured, does not constitute relevant evidence that must even be considered by the ALJ. It is well-settled that, in order to be entitled to DIB, a claimant must be under a disability within the meaning of the Act as of the date his insured status expired. *See* 20 C.F.R. §§ 404.131(a) (2019), 404.320(b)(2) (2019); *see also Johnson v. Barnhart*, 434 F.3d 650, 655-56 (4th Cir. 2005) (to qualify for DIB, a claimant must prove he became disabled prior to the expiration of his date last insured); *Kasey v. Sullivan*, 3 F.3d 75, 77 n.3 (4th Cir. 1993) (same). Here, Addington has neither acknowledged that Dr. Nida's opinion was rendered far outside of the relevant time period, nor has he argued that the limitations contained therein relate back to the relevant time period. Moreover,

there is nothing contained in Dr. Nida's opinion that suggests it was intended to so relate back.

Additionally, as noted above, supportability and consistency, factors considered by the ALJ in deciding to give Dr. Nida's opinion "little weight," were appropriate considerations under the regulations. *See* 20 C.F.R. § 404.1527(c)(3)-(4). Lastly, I find that the ALJ appropriately considered the conservative nature of Addington's treatment during the relevant time period in deciding to give Dr. Nida's opinion "little weight."

In his decision, the ALJ correctly stated that the state agency physicians and psychologists examined Addington's medical evidence of record and opined there was insufficient information to make a decision prior to his date last insured. (R. at 19.) However, he accorded their opinions "some weight." (R. at 19-20.) While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. § 404.1527(c). In fact, even an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. § 404.1527(c)(3) (2019). Also, under the regulations, the ALJ was entitled to rely on the state agency reviewers' assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir.

1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Here, the ALJ correctly noted that, as stated above, while state agency consultants are nonexamining medical sources, their opinions deserve some weight, given that they have a "high level of understanding of the Social Security disability program" and because they "enjoyed a review of all the available evidence in the record when forming their opinions." (R. at 19.) The ALJ also noted that, in cases such as this one, where there exist a number of other reasons to reach similar conclusions, the opinions of such state agency consultants deserve some weight. (R. at 20.) As stated above, the ALJ is entitled to rely on a nonexamining source's medical opinion where it is supported by the record as a whole. *See Alla Z.*, 2018 WL 4704060, at *11; *see also* 20 C.F.R. § 404.1527(c)(3). The ALJ emphasized that all of the evidence Addington submitted at the hearing level related to his non-severe impairments or was for the period after his date last insured with no indication that it related back prior to the expiration of the date last insured. (R. at 20.) That being the case, the ALJ correctly concluded that the state agency consultants, in this case, had the benefit of reviewing the entire record related to Addington's severe impairments. (R. at 20.) The ALJ further correctly indicated that Addington had minimal findings related to his back and knee. (R. at 20.)

Lastly, as the Commissioner states in his brief, a claimant's residual functional

capacity assessment is an administrative finding that is reserved to the ALJ. *See* Social Security Ruling, ("S.S.R."), 96-5p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013). Additionally, the ALJ will consider opinions from medical sources regarding a claimant's residual functional capacity, but he will not give any special weight to such opinions on this issue. *See* 20 C.F.R. § 404.1527(d)(3) (2019) (no special significance given to an opinion on issues reserved to the Commissioner). Therefore, the ALJ is not required to accept the findings or opinion of any medical source in this regard, but is required to consider all of the relevant evidence in assessing a claimant's residual functional capacity assessment. *See* 20 C.F.R. § 404.1545(a) (2019). I find this is what the ALJ did in this case.

In sum, the record contains very few treatment records from the time period relevant to Addington's claim. In fact, there is evidence of only one visit to his primary care provider during this time. Specifically, on July 16, 2012, Addington reported that he felt "very well," and he voiced no complaints or concerns to Dr. Nida. At that time, Addington was treating his osteoarthritis with only over-the-counter aspirin, and he did not complain of back pain at that time. He also reported sleeping "well." Addington's sole musculoskeletal finding on examination consisted of deformities of the PIP joints in both fifth fingers. Dr. Nida concluded that Addington exhibited no somatic dysfunction. He continued to treat him conservatively with aspirin therapy for his osteoarthritis. As the ALJ noted, he did not prescribe any pain medication, he did not recommend steroid injections, and he did not refer Addington for any physical therapy. Accordingly, Dr. Nida placed no restrictions on Addington's activities at that time. Although, at his hearing, Addington reported severe gastrointestinal issues, resulting in frequent restroom trips and a large amount of weight loss, the treatment records do not support such

issues during the time period relevant to Addington's claim. Similarly, although Addington reported staying tired all the time due to sleep difficulty, the relevant treatment notes show that his obstructive sleep apnea was controlled with CPAP therapy, and he indicated he was sleeping "well."

For all the above-stated reasons, I find that substantial evidence supports the ALJ's weighing of the opinion evidence, as well as his resulting residual functional capacity finding and ultimate finding that Addington was not disabled during the relevant time period.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical opinion evidence;
2. Substantial evidence exists in the record to support the ALJ's finding regarding Addington's residual functional capacity; and
3. Substantial evidence exists in the record to support the ALJ's finding that Addington was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Addington's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision deny benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    September 10, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE